UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EUGENIO CALICCHIO,

*Plaintiff*,

**MEMORANDUM & ORDER**
24-cv-01065 (NCM)

– against –

COMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

*Defendant.*

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Eugenio Calicchio brings this action against defendant Commissioner of the Social Security Administration ("Commissioner") seeking judicial review of the Commissioner's decision denying plaintiff's application for disability insurance benefits. *See* Compl. ¶¶ 1, 4, ECF No. 1. Before the Court is plaintiff's motion for judgment on the pleadings ("Mot."), ECF No. 9-1 and the Commissioner's cross-motion for judgment on the pleadings ("Cross-Mot."), ECF No. 11-1. For the reasons stated below, plaintiff's motion is DENIED and the Commissioner's cross-motion is GRANTED.

## BACKGROUND

Plaintiff applied for disability insurance benefits on August 13, 2021, alleging a disability onset date of February 1, 2021. R. 224–26, ECF No. 6.[1] The Commissioner

---

[1]    Throughout this opinion, page numbers for the Certified Administrative Record ("R.") refer to the numbers found in the bottom right corner of each page, rather than the page numbers assigned by the Electronic Case Filing system ("ECF"). All other page numbers for docket filings refer to the page numbers assigned by ECF.

denied plaintiff's application on October 14, 2021, *see* R. 108–14, and again on March 29, 2022, *see* R. 128–39. Plaintiff requested a hearing, *see* R. 146–47, which was held telephonically on January 26, 2023 ("Hearing"), before an Administrative Law Judge ("ALJ"), *see* R. 38–77.

The record that was before the ALJ includes notes and reports from five doctors: Dr. Ailian Chen, M.D., *see* R. 302–07, 354–63; Dr. Allen Meisel, M.D., *see* R. 319–25; Dr. Sultan Khan, M.D., *see* R. 326–53; and state agency medical consultants Dr. S. Gandhi, M.D., *see* R. 79–91, and Dr. A. Lee, M.D., *see* R. 93–107. *See also* Joint Stipulation of Relevant Facts ("Joint Stip."), ECF No. 12 at 3–8.

The administrative record reflects that plaintiff visited his endocrinologist, Dr. Chen, eleven times between January 23, 2020, and January 12, 2023. R. 302–07, 354–58. During each visit, Dr. Chen diagnosed plaintiff with morbid obesity and uncontrolled type II diabetes mellitus. R. 302–07, 354–58. Dr. Chen usually, but not always, observed signs of edema in plaintiff's extremities.[2] Joint Stip. 4–8. Generally, plaintiff was observed with normal skin and non-focal neurological examinations.[3] Joint Stip. 3–8. Stasis[4] was observed in plaintiff's lower extremities upon examination on December 12,

---

[2]    Dr. Chen observed signs of edema in plaintiff's extremities during examinations on January 23, 2020, August 8, 2020, November 21, 2020, May 29, 2021, December 11, 2021, February 19, 2022, June 28, 2022, and January 12, 2023. *See* R. 303, 304, 306, 307, 354, 356–58; Joint Stip. 4–8. However, Dr. Chen observed no signs of edema on October 10, 2020, September 18, 2021, and October 24, 2022. R. 302, 305, 355; Joint Stip. 4–9.

[3]    Plaintiff had two visits with Dr. Chen where Dr. Chen's observations of plaintiff's skin differed. On February 19, 2022, Dr. Chen observed hyperpigmentation in plaintiff's extremities. R. 357. On June 28, 2022, Dr. Chen again observed hyperpigmentation, assessed plaintiff with diabetic neuropathy, and suggested plaintiff visit a neurologist. R. 356; Joint Stip. 4–9.

[4]    Stasis dermatitis involves skin changes caused by poor circulation and resulting pooling of blood in the lower leg. Symptoms may include: leg swelling; aching or

2021, February 19, 2022, and June 28, 2022. R. 356–58; Joint Stip. 7–8. In January 2023, Dr. Chen completed a "Medical Assessment of Ability to do Work-Related Activities" ("Dr. Chen's medical source statement") wherein she opined that plaintiff had the following exertional limitations: plaintiff could lift and carry less than ten pounds occasionally and frequently; stand and/or walk less than two hours in an eight-hour workday; sit less than four hours in an eight-hour workday; occasionally use his hands for fine and gross motor activities; and occasionally reach in all directions. Joint Stip. 8 (citing R. 362–63).

Plaintiff was treated by his primary care physician, Dr. Khan, nine times between February 27, 2021, and January 7, 2023. R. 327–53; Joint Stip. 4–8. Generally, Dr. Khan assessed that plaintiff had the following conditions: (1) hypertensive heart disease without failure; (2) type 2 diabetes mellitus without complications; (3) mixed hyperlipidemia; and (4) morbid obesity due to excess calories. R. 327–53; Joint Stip. 4–8. Initial examination findings from February 27, 2021, showed generally normal systems, and plaintiff denied symptoms such as fatigue, headaches, weight gain or loss, blurred vision, excessive thirst, frequent urination, balance difficulties, dizziness, loss of strength or use of extremities, or pain. Joint Stip. 4 (citing R. 327–28). Dr. Khan observed plaintiff to have full range of motion in his back and musculoskeletal system; no edema in his extremities; and normal strength, tone and reflexes. Joint Stip. 4 (citing R. 328). These symptoms remained consistent throughout Dr. Khan's treatment of plaintiff, with minor exceptions. R. 327–53. In an undated handwritten statement, Dr. Khan indicated

---

heaviness in the legs; and pain that worsens when standing or walking. https://www.mountsinai.org/care/dermatology/services/eczema/stasis-dermatitis (last visited May 20, 2025).

that plaintiff had a history of morbid obesity, diabetes, and lower back pain, but opined that plaintiff could work while sitting. Joint Stip. 8 (citing R. 326).

At the behest of the Social Security Administration, a consultative examiner, Dr. Meisel, performed an "internal medicine examination" of plaintiff on September 29, 2021. R. 319–23; Joint Stip. 5. During the examination, plaintiff complained of pain in his left hip and knees bilaterally and reported a history of gout, hypertension, diabetes, and low testosterone. Joint Stip. 5 (citing R. 319). Plaintiff also reported that he was hospitalized in 2012 for venous stasis in his legs. Joint Stip. 5 (citing R. 319). Plaintiff reported that he was able to cook, clean, do laundry, shop, shower, and dress independently. Joint Stip. 5 (citing R. 320). Upon examination, Dr. Meisel found plaintiff appeared to be in no acute distress, possessed a normal gait, did not use an assistive device, was able to rise from a chair without difficulty, and needed no help changing for the examination or getting on and off the examination table. Joint Stip. 5 (citing R. 320). However, Dr. Meisel found that plaintiff was morbidly obese and unable to squat or walk on his heels or toes. Joint Stip. 5 (citing R. 320). In his musculoskeletal examination, Dr. Meisel observed that plaintiff possessed thoracic kyphosis and decreased range of motion in his lumbar spine, hips, ankles, and knees, but full range of motion in his neck, shoulders, elbows, forearms, wrists, and fingers, with no joint deformity, subluxations, contractures, or ankylosis. Joint Stip. 5–6 (citing R. 321–22). Dr. Meisel observed that plaintiff's right knee was swollen and tender, and noted lymphedema, hyperpigmentation, and skin atrophy in plaintiff's legs. Joint Stip. 6 (citing R. 321–22). Dr. Meisel also observed plaintiff to have equal and physiologic deep tendon reflexes, full strength, and normal sensation in his arms and legs. Joint Stip. 6 (citing R. 321).

4

Additionally, plaintiff's right knee and hips were x-rayed during Dr. Meisel's examination. Joint Stip. 6 (citing R. 324–25). The images showed mild to severe joint space compartment degenerative change and bone spurs in plaintiff's right knee, severe degenerative change in his left hip, and moderate degenerative change in his right hip. Joint Stip. 6 (citing R. 324–25). Dr. Meisel diagnosed plaintiff with bilateral hip pain, bilateral knee pain, stasis dermatitis lymphedema, diabetes, hypertension, and gout. R. 322. As to plaintiff's physical capacities, Dr. Meisel opined that plaintiff has "marked limitations of heavy lifting and carrying"; "[m]arked limitations of climbing ladders and scaffolds and being exposed to unprotected heights"; and "mild to moderate limitations of standing, walking, climbing stairs, bending, and kneeling." Joint Stip. 6 (citing R. 323).

In October 2021, state agency medical consultant, Dr. Gandhi, reviewed the available evidence of record. R. 79–91. Based on the evidence, Dr. Gandhi opined that plaintiff possessed two severe impairments: (1) Osteoarthrosis and Allied Disorders; and (2) Chronic Venous Insufficiency. R. 83. When assessing the consistency of plaintiff's statements regarding his symptoms with other evidence in the record, Dr. Gandhi found that plaintiff's statements were only partially consistent with the other evidence. R. 84. Additionally, Dr. Gandhi assessed that plaintiff had the following exertional limitations: plaintiff was able to occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk (with normal breaks) for a total of 2 hours during an 8-hour workday; and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. R. 85. Dr. Gandhi ultimately opined that plaintiff could perform sedentary work with only occasional postural limitations. R. 85–89; Joint Stip. 6.

In February 2022, Dr. Lee reviewed plaintiff's updated medical record and affirmed Dr. Gandhi's findings. Specifically, Dr. Lee affirmed Dr. Gandhi's finding that

plaintiff could perform sedentary work with occasional postural limitations. Joint Stip. 7 (citing R. 101–04). Following Dr. Lee's consultative assessment, plaintiff visited Dr. Chen and Dr. Khan on four additional occasions each. These visits were not reviewed by any state agency medical consultant. As discussed above, relevant to this petition, Dr. Khan's course of treatment did not change between Dr. Lee's assessment and the ALJ hearing. During this same period, between Dr. Lee's assessment and the ALJ hearing, Dr. Chen's course of treatment did not change, and her findings remained largely the same.[5]

At the Hearing, plaintiff was represented by counsel. R. 41. Plaintiff testified that he stopped working on February 1, 2021 because he sold his insurance business. Joint Stip. 2 (citing R. 44–45). Plaintiff testified that most of his job duties at his insurance business were performed sitting while using a computer or phone but at times he was required to stand up and walk through his office to retrieve files or documents, which could be difficult due to circulation issues in his legs and arthritis in his hips and knees. Joint Stip. 2 (citing R. 47). Continuing to explain, plaintiff testified: "my job was mainly sitting down but still I have the issue where walking is an issue, getting up is an issue sometimes. Standing too long is an issue. There's a lot of issues with the circulation and on top of it [] the arthritis." R. 51. Plaintiff testified that he lives alone and generally spends his days "[s]itting, getting up" and "follow[ing] the same routine" where he independently shaves, showers, drinks a cup of coffee, eats a bit of cereal, reads, and makes some phone calls. R. 64; *see also* Joint Stip. 2. He testified that when he is sitting down, he typically

---

[5]      *See supra* n. 2–3 and p. 2. During visits occurring after Dr. Lee's assessment, Dr. Chen observed plaintiff to have edema on three of the four visits, stasis in his extremities on two of the four visits, hyperpigmentation in his extremities on two of four visits, and diabetic neuropathy on one of the four visits. Dr. Chen's treatment recommendations remained largely unchanged.

has his lower extremities elevated; he sits in a recliner at home that helps him elevate his feet. Joint Stip. 2 (citing R. 64).[6]

An impartial vocational expert ("VE"), Renee Jubrey, also testified at the Hearing. R. 40–41, 65–70. The ALJ presented the VE with a hypothetical individual who "needs to elevate their legs to a degree that requires them to recline . . . and have their legs at heart level." R. 68. The VE agreed that requiring that position "would preclude people from being productive while sitting down." R. 68–69.  The VE also opined that semiskilled and skilled workers could be off task for up to 15% of the workday. R. 69. The VE testified that plaintiff's past relevant work is considered an "insurance sales agent" (DOT: 250.257-010) and was skilled with a specific vocational preparation ("SVP") code of 6. R. 42–43. As performed by plaintiff, the VE considered the position, per DOT, as "light-work" with an SVP of 6, but noted that plaintiff reported lifting between 10 to 50 pounds "which would put that in a heavy exertional range[.]" R 43. The VE opined that plaintiff's past relevant work skills, as performed, were transferable to sedentary work, specifically citing three potential positions: (1) reviewer (DOT: 209.687-018, SVP 4); (2) placer (DOT: 239.267-010); and (3) claims clerk I (DOT 241.362-010, SVP 4). R. 65–68.

After testimony was completed, the ALJ and plaintiff's counsel discussed sending plaintiff for another consultative examination or to obtain another medical expert

---

[6]     As part of his benefits application, plaintiff completed a function report in January 2022 where he reported that he lives alone, can perform personal care tasks and take medicine without reminders, prepare his own meals daily, clean his home, and do his laundry. Joint Stip. 1 (citing R. 265–66). Plaintiff listed "TV watching" as his only current hobby or interest. R. 267. He alleged physical limitations when sitting or standing for long periods of time and walking for periods of time due to arthritis in his knees and left hip. Joint Stip. 1–2; R. 265. Plaintiff reported handling stress and changes in routine "very well." Joint Stip 2. (citing R. 268). He also reported being limited by the venous stasis in his legs. R. at 265.

opinion. Joint Stip. 3; R. 74. Plaintiff's attorney proposed the ALJ "possibly send [plaintiff] out for a[] [medical examination] that's going to provide us . . . a specific RFC what his capabilities are." R. 74. Responding, the ALJ acknowledged "Yeah, and I mean we are one and a half years out from his last [consultative examination], so you know, presumably, you know, whatever existed back then might have changed good or bad depending on what the new evaluation is. So I'll hold—you know what, I'll keep that into consideration." R 74–75. Appearing to be thinking out loud about whether to get additional medical opinions, the ALJ stated "maybe I can get to the point where I can explain, you know, this is an individual that's got to have his legs elevated a majority of the day." R 75. Addressing plaintiff, the ALJ stated:

> I'm just trying to find documentation of these—the lower extremity swelling. Because again, if I'm going to find that, you know, you got to take a lot of breaks or  you're going to be intermittently off task throughout the day because of your symptoms or you got to recline, I got to point to something in the record that's going to allow me to say, you know, over the course of this now almost—you know, we're two years removed from when you sold the business. And I don't know if I—my initial notes just didn't have enough objective evidence in the file in terms of exam findings. So I might have to send you out to that [consultative examiner].

R. 76.

On March 27, 2023, without further developing the record, the ALJ issued a written opinion finding that plaintiff "has not been under a disability, as defined in the Social Security Act, from February 1, 2021, through the date of this decision." R. 7–26. Plaintiff requested review of the ALJ's decision by the Social Security Administration Appeals Council, which declined review in January 2024. R. 1–6. Plaintiff filed this appeal of the Commissioner's decision in February 2024. *See* Compl. Plaintiff moved for judgment on the pleadings pursuant to Rule 12(c); the Commissioner filed a cross-motion for the same relief. *See* ECF Nos. 9-1 and 11-1.

## STANDARD OF REVIEW

A district court reviewing a final decision of the Commissioner is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C § 405(g); *see* Fed. R. Civ. P. 12(c) (allowing courts to enter a judgment on the pleadings). Nonetheless, federal judicial review is "limited." *Rubin v. Martin O'Malley, Comm'r of Soc. Sec.*, 116 F.4th 145, 154 (2d Cir. 2024).[7] Reviewing courts "do not substitute" their own "judgment for the agency's" or review the record *de novo*. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). Instead, "[w]e conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Rubin*, 116 F.4th at 154.

In conducting this review, courts must determine (1) "whether the correct legal standards were applied," and (2) "whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 415 F.3d 101 (2d Cir. 2005); *see also Rucker v. Kijakazi*, 48 F.4th 86, 90–91 (2d Cir. 2002). Whether the record contains "substantial evidence" depends on whether "a reasonable mind might accept" the evidence "as adequate to support" the ALJ's determination. *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (explaining that "[t]he phrase substantial evidence is a term of art used throughout administrative law to describe how courts are to review agency factfinding"). The "threshold for such evidentiary sufficiency is not high"; it requires only that the record contain "more than a mere scintilla" of evidence. *Id.*

---

[7]    Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

at 103. The court must uphold the Commissioner's conclusion so long as it is supported by a "rational interpretation" of the evidence. *Rubin*, 116 F.4th at 155. However, courts must still "examine contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.*

"Before determining whether the Commissioner's final decision is supported by substantial evidence[,] the court must first be satisfied that the ALJ completely developed the administrative record." *Kelly v. Comm'r of Soc. Sec.*, No. 20-cv-05318, 2024 WL 5120051, at *9 (E.D.N.Y. Dec. 16, 2024). The ALJ has a "well-established" obligation to investigate and develop the record, even where a claimant is counseled—this "has been described as a bedrock principle of Social Security law." *Id*. An ALJ can take steps to further develop the record by, *inter alia*, "re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others." *Bryant v. Comm'r of Soc. Sec.*, 20-cv-06933, 2022 WL 17540581, at *13 (S.D.N.Y. Nov. 21, 2022), *report and recommendation adopted*, 2022 WL 17540540 (Dec. 6, 2022) (citing 20 C.F.R. §§ 404.1520b, 416.920b). Where the presiding ALJ did not apply the correct legal standard or sufficiently develop the record, a court may remand the case for further proceedings. *See Sczepanski v. Saul*, 946 F.3d 152, 161–62 (2d Cir. 2020); *Daniels v. Kijakazi*, 617 F. Supp. 3d 180, 195 (S.D.N.Y. 2022).

## DISCUSSION

### I. Statutory and Regulatory Disability Benefit Requirements

The Social Security Administration administers social security disability insurance benefits to eligible applicants pursuant to the Social Security Act ("SSA"). *See generally* 42 U.S.C. § 301 *et. seq*. To secure benefits, an applicant must demonstrate, among other things, that he is disabled. For purposes of social security disability insurance benefits,

disability is defined as an impairment or combination of impairments that renders an individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner, acting through a presiding ALJ, assesses whether an applicant's impairments or combination of impairments meets the statutory definition of disability by undertaking a "five-step sequential evaluation process." 20 C.F.R. § 404.1520(a)(4). The Commissioner only advances to the next step of the evaluation process where a determination of an applicant's disability status cannot be made at that stage. *Id.*

The first step in this process is to evaluate the applicant's current work activity; a disability determination will be denied where an applicant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At the second step, the Commissioner "considers the medical severity of the claimant's impairment or combined impairments." *Rubin*, 116 F.4th at 147 (citing 20 C.F.R. § 404.1520(a)(4)(ii)). At the third step, the Commissioner considers whether the applicant's impairment "meets or equals" one of the listings in Appendix 1 of Part 404, Subpart P ("Listed Impairment"). 20 C.F.R. § 404.1520(a)(4)(iii). If the applicant's impairments do not meet or equal a Listed Impairment, the Commissioner determines the claimant's RFC, which is the claimant's ability to function in a workplace despite medical limitations "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). At step four, the Commissioner assesses whether the claimant can perform past relevant work when considering the claimant's RFC. 20 C.F.R. § 404.1520(a)(4)(iv).

If the claimant cannot perform his past relevant work, the fifth and final step is to consider whether an applicant, given his RFC, age, education, and work experience, can perform other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). The claimant "bears the burden of proof in the first four steps of the sequential inquiry." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). However, at step five, "the burden shifts, to a limited extent, to the Commissioner to show that other work exists in significant numbers in the national economy that the claimant can do." *Rubin*, 116 F.4th at 148.

## II.    The ALJ's Determination

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since February 1, 2021. R. 12. At step two, the ALJ found that plaintiff suffered from the following medically severe impairments: osteoarthritis of the right knee and hips and lower extremity stasis dermatitis lymphedema. R. 12.[8] At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meet or medically equal the severity of one of the listings in Appendix 1 of Part 404, Subpart P, 20 C.F.R. § 404.1520(a)(4)(iii).[9] In assessing plaintiff's RFC at step four, the ALJ found that

---

[8]    The ALJ acknowledged and considered evidence establishing plaintiff's additional medically determinable impairments of hypertension, diabetes with peripheral neuropathy, obesity, gout, hypogonadotropic/hypogonadism, hyperlipidemia, and vitamin D deficiency, but found "insufficient evidence to support a conclusion that these conditions significantly limit the claimant's ability to perform basic work activities or result in any specific functional impairment of 12-months duration." R. 12–13. Plaintiff does not contest this finding.

[9]    The ALJ evaluated plaintiff's osteoarthrosis under Listing 1.18 (Abnormality of a major joint in an extremity) and plaintiff's lower extremity stasis dermatitis lymphedema under listing 4.11 (Chronic venous insufficiency) and found no evidence of listing level severity for either. R. 14. Plaintiff does not contest this finding.

plaintiff has the RFC to perform sedentary work,[10] with the following additional limitations:

> he is able to change positions as needed but he would remain within the customary off-task tolerances of no more than 15% of an 8-hour workday; no balancing on wet, uneven, or vibrating surfaces; no climbing of ladders, ropes, and scaffolds; no more than occasional climbing of ramps and stairs, stooping, kneeling, crouching, or crawling; no pushing or pulling with the lower extremities; no operation of foot controls; no working around unprotected heights or heavy moving machinery.

R. 15.

In formulating this RFC, the ALJ considered plaintiff's reported symptoms before finding that plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." R. 16. The ALJ found the opinions of the state agency consultants, Drs. Gandhi and Lee, "broadly consistent with the record evidence and persuasive," while finding the opinion of plaintiff's endocrinologist, Dr. Chen, not "entirely persuasive." R. 17–19. The ALJ also found the opinions of plaintiff's primary care physician, Dr. Khan, and the opinion of consultative examiner, Dr. Meisel, "of limited persuasiveness." R. 18–19.

At step four, after assessing plaintiff's RFC, the ALJ found that plaintiff was capable of performing his past relevant work as an insurance sales agent, which, as

---

[10]    As defined in 20 C.F.R. § 404.1567(a): "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

actually performed by plaintiff, was consistent with the demands of sedentary work. R. 20–21. Although not required, the ALJ made an alternative finding at step five that after considering plaintiff's "age, education, work experience, transferable skills, and residual functional capacity," there are other jobs in the national economy that plaintiff can also perform, including claims clerk, reviewer, and placer. R. 20–21.[11] Based on these findings, the ALJ concluded that plaintiff was not disabled, as defined by the Social Security Act, from February 1, 2021, through the date of the decision. R. 21.

### III. The Court's Analysis of the ALJ's Determination

Plaintiff appeals the ALJ's decision on four grounds, that the ALJ: (1) improperly considered the medical opinion evidence; (2) improperly determined that plaintiff is capable of sedentary work; (3) failed to explore the possible impact of plaintiff's arthritic pain and leg edema on his employability; and (4) failed to develop the record by declining to order an additional medical examination to evaluate how often plaintiff would need his legs elevated while working. *See* Mot. 9–12. In response, the Commissioner contends that the ALJ's decision was supported by substantial evidence and free of legal error. *See* Cross-Mot. 9–15. For the reasons stated below, the Court finds that the ALJ's determination is supported by substantial evidence and remand is not warranted.

#### A. The ALJ Properly Considered the Medical Opinions

First, plaintiff contends that the ALJ erred while assessing the medical opinions before determining the disputed RFC. Specifically, plaintiff suggests the ALJ should have

---

[11]    The ALJ specifically cited: "claims clerk I (DOT 241.362-010; SVP 4, semi-skilled, with approximately 35,000 jobs available in the national economy); reviewer (DOT 209.687-018; SVP 4, semi-skilled, with 14,000 jobs available in the national economy); and placer (DOT 239.267-010; SVP 5, skilled, with approximately 85,000 jobs available in the national economy)" R. 21.

relied on the opinions of his endocrinologist, Dr. Chen, and the consultative medical examiner, Dr. Meisel, instead of the opinions of the state agency medical consultants, Drs. Gandhi and Lee. *See* Mot. 9–11.

In evaluating medical opinions, the ALJ must consider the following factors, among others: supportability, consistency, the author's relationship with the claimant, and the author's specialization. *See* 20 C.F.R. § 404.1520c(c)(1)–(5). The "most important" factors are supportability and consistency. *Rubin*, 116 F.4th at 148. Supportability of a medical opinion considers "how well a medical source supported and explained their opinion." *Daniels*, 617 F. Supp. 3d at 189. An ALJ considers the consistency of a medical opinion through "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Id.* The ALJ must "explain how he considered supportability and consistency as applied to each medical source's opinion in his determination or decision" and may not "give any specific evidentiary weight" to any particular opinion by default. *Rubin*, 116 F.4th at 149. Although an "explanation need not be exhaustive," the Court must be able to "glean the rationale of an ALJ's decision." *Daniels*, 617 F. Supp. 3d at 190.

An ALJ's "failure to properly consider and apply the requisite factors is grounds for remand." *Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 161 (S.D.N.Y. 2022). Similarly, if an ALJ "bases [his] explanation upon a misreading of the record, remand is required." *Rivera v. Comm'r of the Soc. Sec. Admin.*, No. 19-cv-04630, 2020 WL 8167136, at *14 (S.D.N.Y. Dec. 30, 2020), *report and recommendation adopted sub nom.*, 2021 WL 134945 (Jan. 14, 2021).

Contrary to plaintiff's contention, the ALJ did not improperly give controlling weight to the opinions of Drs. Gandhi and Lee and dismiss the other medical evidence in

15

the record. Rather, the ALJ "separately evaluated the persuasiveness of each medical opinion, as required by section 404.1520c." *Parent v. O'Malley*, No. 23-917, 2024 WL 3342463, at *1 (2d Cir. July 9, 2024). In compliance with 20 C.F.R. § 404.1520c(a)–(b), "the ALJ addressed each opinion in turn," explaining why he found, or did not find, "each opinion to be supported by the record and consistent with the other evidence." *Rushford v. Kijakazi*, No. 23-317, 2023 WL 8946622, at *2 (2d Cir. Dec. 28, 2023).

Here, the ALJ considered Dr. Chen's January 2023 medical source statement, which opined that plaintiff possessed the following exertional limitations: "lifting and carrying less than 10 [pounds] occasionally and frequently; standing and walking less than 2 hours in an 8-hour workday; sitting for less than 4 hours in an 8-hour workday; performing fine and gross motor functions no more than occasionally; and reaching in all directions no more than occasionally." R. 19 (citing R. 362–63). The ALJ found that Dr. Chen's medical source statement was "not supported by any objective findings outlined in [the] accompanying treatment records" because: (1) "[t]here are no physical examination findings documented in those records to support the functional limitations assessed;" (2) Dr. Chen's own records "fail to document any subjective complaints to corroborate the extent of these restrictions;" and (3) Dr. Chen's "conclusions are not explained by any narrative rationale." R. at 19. The ALJ correctly pointed out that there is nothing explicit in Dr. Chen's own records, or any other physician's records, to support Dr. Chen's opinion that plaintiff is limited to "occasional use of the upper extremities" or possesses a "reduced sitting capacity." R. 19.

Additionally, during the RFC analysis, the ALJ cited inconsistencies in plaintiff's treatment records from Dr. Chen. R. 16. The ALJ accurately described that while Dr. Chen's physical examinations found plaintiff had "edema, hyperpigmentation, and

16

sta[s]is in his bilateral lower extremities" contemporaneous examinations performed by plaintiff's primary care physician, Dr. Khan, "were unremarkable for any edema." R. 16 (citing R. 356–60).[12] These inconsistencies led the ALJ to opine that "[w]hen viewed collectively, these treatment records and clinical observations support[] a finding that [plaintiff's] symptoms of venous sta[s]is and swelling are only intermittent and would not prevent him from performing the strength demands of sedentary work on a regular and continuous basis." R. 16.

Next, the ALJ found the September 2021 opinion of the consultative examiner, Dr. Meisel, "of limited persuasiveness." R. 18 (citing R. 319–25). Extracting separate aspects of Dr. Meisel's opinion, the ALJ found the opinion "generally persuasive with respect to the functional areas assessed." R. 18. The ALJ reasoned that Dr. Meisel's opinions regarding plaintiff's limitations are "consistent with the limited strength demands of sedentary work" and also "consistent with his clinical observations of 4+ lymphedema from the knees to ankles bilaterally in addition to hyperpigmentation and atrophy of the skin in his legs due to stasis dermatitis." R. 18.

However, the ALJ noted that Dr. Meisel's observations during his one-time examination of plaintiff were not consistent with plaintiff's "clinical presentation throughout the longitudinal treatment records." R. 19. The ALJ correctly pointed to three of plaintiff's examinations from the same year with Dr. Khan where plaintiff's extremities appeared normal, with no indication of clubbing, cyanosis, or edema. R. 19 (citing R. 331–37). The ALJ also pointed to another three examinations in 2021 with Dr. Chen where plaintiff "showed either normal reviews of his bilateral lower extremities or only trace

---

[12]    This Court notes that those visits with Dr. Khan also did not report any signs of hyperpigmentation or stasis in his bilateral lower extremities.

edema." R. 19 (citing R. 354–61). The ALJ considered Dr. Meisel's opinions and credited them only to the extent that plaintiff's impairments "limit his ability to perform the strength demands beyond sedentary work" but ultimately reasoned that the other aspects of Dr. Meisel's opinion "are not consistent with or supported by the longitudinal evidence of record." R. 19.

Next, the ALJ considered the opinions of the state agency medical consultants, Drs. Gandhi and Lee, and found them to be "broadly consistent with the record evidence and persuasive." R. 17 (citing R. 79–91, 93–107). The ALJ described how Dr. Gandhi opined that plaintiff's "osteoarthritis and venous insufficiency are severe impairments, but would not prevent him from performing a range of sedentary work." R. 17 (citing R. 79–91). The ALJ noted that Dr. Gandhi's RFC assessment relied on evidence showing "a history of remote injury to the left hip" and X-ray images from Dr. Meisel's consultation showing "degenerative joint disease affecting the right knee, pelvis and bilateral hips." R. 17–18. The ALJ also pointed to Dr. Gandhi's observations that, during the consultative examination with Dr. Meisel, plaintiff was found with "reduced range of motion on several planes of mobility, an inability to perform heels and toe walking, an inability to perform a full squat and clinical observations of lymphedema from the ankles bilaterally." R. 18. The ALJ described how Dr. Gandhi contrasted these observations with findings that plaintiff "demonstrated intact muscle strength of 5/5 in all extremities." R. 18.

The ALJ explained that Dr. Lee affirmed Dr. Gandhi's findings and "not[ed] that the record did not contain any updated medical records that would support deviating from the residual functional capacity offered by Dr. Gandhi." R. 18 (citing R. 93–107). In concluding, the ALJ found the RFC capacity offered by Drs. Gandhi and Lee to be "highly persuasive and consistent with the objective medical evidence of record" and the

"restriction to the sedentary exertion consistent with the physical examination findings of record, the diagnostic studies, and the claimant's conservative course of treatment." R. 18.

The ALJ's finding that the state agency medical consultants' opinions were more persuasive than that of plaintiff's treating endocrinologist, Dr. Chen, is not inherently improper. In *Rushford*, the Second Circuit found the ALJ did not err in concluding that the medical opinions of reviewing consultants undercut and were more persuasive than those offered by plaintiff's primary care provider and one of the agency's examining consultants. *See Rushford*, 2023 WL 8946622, at *1 (citing *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998); *see also Parent*, 2024 WL 3342463, at *1–2 (the ALJ did not act improperly when finding the opinions of non-examining consultants more persuasive than examining consultants); *Vazquez v. King*, No. 23-7816-cv, 2025 WL 366427, at *1 (2d Cir. Feb. 3, 2025) (finding "the ALJ properly declined to give controlling weight" to plaintiff's treating physician's opinion "when the opinion is inconsistent with other substantial evidence in the record"); *Knief v. Comm'r of Soc. Sec.*, No. 20-cv-06242, 2021 WL 5449728, at *6 (S.D.N.Y. Nov. 22, 2021) ("Under the new regulations, a treating doctor's opinion is no longer entitled to a presumption of controlling weight.").

For claims filed after March 27, 2017, such as plaintiff's, "the ALJ was not required to give special deference to the opinion of [plaintiff's] treating physician." *Rushford*, 2023 WL 8946622, at *1. As courts in this circuit have "repeatedly emphasized, it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Villier on behalf of N.D.D.R.*, 23-cv-00893, 2024 WL 2174236, at *3 (2d Cir. May 15, 2024). Therefore, the ALJ complied with 20 C.F.R. § 404.1520c by evaluating the supportability and consistency of the medical opinions in the record and did not err by finding

unpersuasive Dr. Chen's opinion that plaintiff possessed extreme limitations on all work, and that those limitations precluded even sedentary work. *See Sutton v. Comm'r of Soc. Sec.*, No. 23-cv-01392, 2024 WL 2882630, at *3 (E.D.N.Y. June 6, 2024) ("In this instance, the ALJ reasonably determined that based on the entirety of the record . . . [plaintiff's treating physician's] opinion overstates the extent of the [plaintiff's] exertional limitations for standing, sitting and walking.").

Plaintiff next disputes the credibility of the state agency medical consultants' opinions because they were conducted before the Hearing and the consultants "never saw Dr. Chen's [January 2023] evaluation," which is a "point that seems to have escaped the ALJ's attention." Mot. 11. To the contrary, during his analysis, the ALJ acknowledged that Drs. Gandhi and Lee did not have an opportunity to review Dr. Chen's and Dr. Kahn's reports from plaintiff's final four visits with each, but concluded that "these updated medical records do not reveal any material change in terms of clinical presentation, course of treatment, or clinical assessments that would support deviating significantly from the physical residual functional capacity offered by the state agency consultants." R. 18. This Court agrees with the ALJ's reasoning and finds plaintiff's arguments on this point unpersuasive. *See Camille v Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (rejecting plaintiff's argument that state agency consultant's opinion was stale because the assessment was more than a year before the hearing and did not consider evidence submitted after their assessment, the Court found "no case or regulation [plaintiff] cites imposes an unqualified rule that a medical opinion is superseded by additional material in the record"); *see also Giron v. Kijakazi*, 22-cv-06226, 2023 WL 6121764, at *11 (S.D.N.Y. Sept. 19, 2023) ("[A] medical opinion does not become stale when new material is added to the record unless the additional material raises doubts as to the reliability of

the opinion."). Additionally, the ALJ acknowledged that Drs. Gandhi and Lee did not have the opportunity to review Dr. Chen's medical source statement but reasoned that this was not necessary because ultimately, he did not find Dr. Chen's medical source statement persuasive. R. 18.

Therefore, contrary to plaintiff's arguments, the ALJ adequately explained how he determined the persuasiveness of each medical opinion after assessing its supportability and consistency with the record as a whole. Remand is not warranted on this basis.

### B.   *The ALJ Properly Determined Plaintiff's RFC*

Plaintiff next contends that the ALJ's determination that plaintiff possesses an RFC for sedentary work was not supported by substantial evidence. Mot. 9–12. An RFC assessment evaluates a claimant's ability to function in a workplace despite medical limitations, "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). The RFC determination describes "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545(a)(1). "In making the RFC determination, the ALJ is entitled to weigh all of the evidence available to make an RFC finding that is consistent with the record as a whole." *Porteus v. O'Malley*, No. 23-969, 2024 WL 2180203, at *2 (2d Cir. May 15, 2024). Accordingly, "the ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence." *Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). "In the end, the ALJ's findings need only afford an adequate basis for meaningful judicial review, apply the proper legal standards, and be supported by substantial evidence." *Porteus*, 2024 WL 2180203, at *2.

Here, the ALJ concluded that, after careful consideration of the entire record, plaintiff had the RFC to perform sedentary work, *see* n.11, with additional physical and

postural limitations. R. 15. *See* SSR 96-9p, 61 Fed. Reg. 34478, 34480 (July 2, 1996); *see also McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) ("[S]edentary work is generally defined as work in a sitting position for six hours of an eight-hour workday."). To make this finding, the ALJ cited Dr. Khan's notes over two years of treatment, which "reveal[ed] entirely normal physical examinations." R. 16 (citing R. 327–53). The ALJ reasoned that plaintiff's testimony "concerning chronic swelling and pain in his lower extremities and musculoskeletal pain in his right knee[] and bilateral hips" conflicted with Dr. Khan's treatment records showing plaintiff "consistently presented as alert and in no acute distress with no gait or balance deficits, with full and painless range of motion of his back and musculoskeletal system, normal reviews of his extremities, and normal muscle strength and muscle tone throughout" as well as "no clubbing, cyanosis, or edema in his legs." R. 16.

Additionally, as mentioned above, after considering Dr. Chen's and Dr. Khan's conflicting records as to plaintiff's edema, hyperpigmentation, and stasis in his bilateral lower extremities, the ALJ concluded that "viewed collectively, these treatment records and clinical observations support[] a finding that [plaintiff's] symptoms of venous sta[s]is and swelling are only intermittent and would not prevent him from performing the strength demands of sedentary work on a regular and continuous basis." R. 16.

Further, the ALJ's finding that plaintiff could complete sedentary work is supported by Dr. Khan's opinion that plaintiff could work while sitting. While the ALJ's RFC finding conflicted with Dr. Chen's medical source opinion that plaintiff could not sit for more than 4 hours during an 8-hour workday, where the medical evidence in the plaintiff's record is inconsistent, "the ALJ [is] entitled to weigh the conflicting evidence in the record and resolve any such conflicts." *Porteus*, 2024 WL 2180203, at *2 (quoting

*Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998)). Here, the ALJ's RFC determination is supported by the medical evidence in the record when considered as a whole. For example, during each of plaintiff's nine visits with Dr. Khan, plaintiff was observed to have full range of motion in all systems; no edema in his extremities; and normal strength, tone and reflexes; and during plaintiff's eleven visits with Dr. Chen, plaintiff was usually, but not always, observed with signs of edema in his extremities; generally observed to have normal skin and non-focal neurological examinations; and sometimes observed to have signs of stasis in his extremities. Although plaintiff was consistently found by both physicians to suffer from morbid obesity and uncontrolled type II diabetes, these conditions were accompanied by physical conditions that did not conflict with an RFC for sedentary work.

Additionally, plaintiff's reported daily activities undercut his own testimony, as well as Dr. Chen's opinion, that plaintiff's physical capabilities are extremely restricted. Despite his conditions, plaintiff reports that he lives alone, performs personal care tasks, prepares meals daily, cleans, and does laundry. *See* Joint Stip. 1 (citing R. 265–66); *see e.g. Medina v. Comm'r of Soc. Sec.*, 831 F. App'x 35, 36 (2d Cir. 2020) (affirming denial of benefits where "[t]he ALJ found that [plaintiff's] activities [were] not limited in the way one would expect given her complaints of disabling symptoms and limitations").

In arguing that he does not have the capacity for sedentary work, plaintiff cites to X-ray reports submitted with Dr. Meisel's evaluation showing degenerative arthritis in plaintiff's right knee and both hips. Mot. 10. Plaintiff also points to Dr. Meisel's opinion that plaintiff possesses marked limitations for heavy lifting and carrying, as well as mild-to-moderate limitations on standing, walking, climbing stairs, bending, and kneeling. Mot. 10. However, plaintiff cites no authority suggesting that these limitations conflict

with sedentary work. *See Rosa v. Comm'r of Soc. Sec.*, 19-cv-01433, 2022 WL 2274720, at *9 (E.D.N.Y. June 23, 2022) ("[P]laintiff cites no authority for the proposition that a 'marked' limitation for carrying is inconsistent with sedentary work—which involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."). In fact, "courts in this circuit have held that moderate limitations in prolonged sitting, standing, and walking are not inconsistent with an ability to perform sedentary work." *Id.* at *10. Moderate limitations for standing and sitting have even supported RFCs for light work, which is less restrictive than sedentary work. *See e.g., White v. Berryhill*, 753 F. App'x 80, 82 (2d Cir. 2019) (finding substantial evidence supported ALJ's finding of an RFC to perform light work after ALJ considered medical opinions indicating a moderate limitation in standing, sitting, and performing other activities); *see also Gonzalez v. Comm'r of Soc. Sec.*, No. 21-cv-00800, 2022 WL 3348386, at *12 (S.D.N.Y. May 27, 2022).

The ALJ also accurately acknowledged that during plaintiff's evaluation with Dr. Meisel, plaintiff "presented as morbidly obese with a normal unassisted gait, inability to walk on heels or toes, and inability to perform a squatting activity," which contrasted with Dr. Meisel's other observations that plaintiff "did not need any assistance changing for the exam, getting on and off the examination table, and rising from a chair without difficulty." R. 16–17 (citing R. 319–25). The ALJ accurately noted that Dr. Meisel's examination of plaintiff's musculoskeletal system showed "full and painless mobility of his cervical spine, shoulders, elbows, forearms, wrists, and fingers bilaterally" but also "reduced mobility of the lumbar spine, bilateral hips, and bilateral knees." R. 17 (citing R. 319–25). Next, the ALJ appropriately considered that Dr. Meisel's review of plaintiff's extremities found "4+ lymphedema from the knees to ankles bilaterally in addition to

hyperpigmentation and atrophy of the skin from venous sta[s]is" but "the remainder of the examination showed no muscle atrophy throughout the legs, normal muscle strength of 5/5 throughout, and normal sensory functioning throughout." R. 17. Finally, the ALJ accurately considered X-ray images of plaintiff's right knee revealing "severe medial tibiofemoral, moderate patellofemoral, and mild lateral tibiofemoral joint space compartment degenerative changes," and X-ray images of his pelvis revealing "severe left hip degenerative changes and moderate right hip degenerative changes." R. 17. The ALJ did not entirely discredit these reports and opinions from Dr. Meisel but instead concluded that "[a]lthough these diagnostic findings corroborate some of the claimant's musculoskeletal pain complaints, the undersigned is not persuaded by the evidence as a whole that the claimant is physically unable to perform the work duties of his past relevant work as actually performed." R. 17 (citing R. 271). The ALJ noted that the additional restrictions of the RFC finding "more than adequately address" plaintiff's subjective complaints that were supported by Dr. Meisel's objective medical findings. R. 17.

These additional restrictions include that plaintiff is required to change positions as needed, avoid certain dangerous surfaces and actions, and only occasionally stoop, kneel, crouch, crawl, or climb ramps and stairs. R. 15. *See also Forrest v. Comm'r of Soc. Sec.*, 23-cv-00307, 2025 WL 788996, at *19 (E.D.N.Y. Mar. 12, 2025) ("[I]n finding that Plaintiff was still capable of a reduced range of sedentary work, the ALJ did not reject Plaintiff's allegations entirely, but rather assessed significant RFC restrictions."). Here, despite plaintiff's history of osteoarthritis of the right knee and hips and stasis dermatitis lymphedema in legs, the medical and non-medical evidence supports a finding that plaintiff retains an RFC for sedentary work with additional physical and postural limitations. Therefore, substantial evidence supports the ALJ's RFC determination and

plaintiff "has not demonstrated that a reasonable factfinder would have to assess any greater limitations." *Porteus*, 2024 WL 2180203, at *2.

### C.  The ALJ Properly Considered Plaintiff's Pain

Plaintiff argues that "the ALJ made no effort to explore the possible impact that [his] arthritic pain and leg edema might have on his ability to engage in employment in the cited skilled occupations." Mot. 12. Plaintiff appears to argue that his arthritic pain and leg edema should have been built into the RFC or that the ALJ should have questioned the VE on this topic. Despite plaintiff's contentions, the ALJ did consider plaintiff's reports of pain and swelling. Earlier in his decision, the ALJ reasoned that "[d]espite the claimant's testimony concerning chronic swelling and pain in his lower extremities and musculoskeletal pain in his right knees and bilateral hips, a collective review of these treatment records since February 2021 shows he consistently presented as alert and in no acute distress." R. 16. The ALJ also considered Dr. Khan's examinations which consistently found no signs of edema. R. 16 (citing R. 328, 331, 334, 336, 339, 342, 345, 348, 351). In the end, the ALJ stated that the RFC assessment "granted maximum deference to the claimant's testimony of pain and swelling in his legs and the need to change positions (to minimize swelling), and [found] the additional restrictions addressing off task behavior and more restrictive postural limitations are warranted." R. 18. The RFC determination permits plaintiff to "change positions as needed" and be off-task "no more than 15% of an 8-hour workday." R. 15.[13] The ALJ found that "these additional limitations do not significantly erode the sedentary occupational base." R. 18.

---

[13]    As the ALJ pointed out, the Dictionary of Occupation Titles (DOT) does not contemplate the ability to change position as needed nor does it address standards for off-task behavior, but the VE testified to finding semiskilled to skilled occupations tolerate between 10% and 15% off-task time. R. 21, 69.

This Court agrees and finds the ALJ properly considered evidence of pain and edema in determining plaintiff's RFC.

Plaintiff also contends that it should be "self-evident that skilled work requires attention and mental focus" and "[p]ain can seriously interfere with successful sustained performance of a skilled job." Mot. 12. Plaintiff's argument is meritless because his records are devoid of any evidence suggesting difficulty paying attention or maintaining focus due to pain. *Cf. Edward v. Astrue*, No. 10-cv-05890, 2011 WL 4344541, at *8 (E.D.N.Y. Sept. 13, 2011) (remand was required  where "cognitive capacity to do skilled work was a critical issue, [][and] testimony should have made it clear to the ALJ that an additional inquiry into the plaintiff's cognitive abilities was necessary and that without such an inquiry an adverse decision would not be supported by substantial evidence."); *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 742 (S.D.N.Y. 2018) ("Plaintiff's non-severe anxiety and memory impairments may have affected the vocational expert's conclusion that plaintiff could do her past skilled and semi-skilled sedentary work."). Plaintiff cites no authority or evidence in the record to support his contention that difficulty paying attention or maintaining focus due to pain would inhibit his ability to complete skilled occupations. Therefore, the ALJ was under no obligation to pose this hypothetical to the VE. *Thomas C. W. v. Kijakazi*, 666 F. Supp. 3d 202, 220 (N.D.N.Y. 2023) ("Notably, at the fourth step of the disability analysis, the claimant has the burden to show an inability to return to his previous specific job and an inability to perform his past relevant work generally.") (quoting *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003)).

Additionally, the ALJ offered plaintiff's counsel the opportunity to pose questions to the VE, where plaintiff's counsel could have inquired into the focus requirements of

skilled sedentary work, but counsel declined to ask any questions. *See* R. 70 (ALJ: "[counsel], do you have any factors that you want to address..."; Atty: "No, Your Honor. I believe they've all been addressed."); *see also Brenda C. v. Kijakazi,* No. 21-cv-01650, 2023 WL 2743290, at *7 (D. Conn. Mar. 31, 2023) (finding the ALJ did not improperly classify plaintiff's past relevant work and noting plaintiff's failure to question the VE at the hearing).

### D.  The ALJ's Duty to Develop the Record

Lastly, plaintiff contends the ALJ failed to develop the record where he declined to order another consultative examination. Mot. 11–12. In particular, plaintiff argues that the new medical examination may have supported a finding that plaintiff must have his legs elevated the majority of the day, which, according to the ALJ's statements during the Hearing, could have resulted in a more restrictive RFC and a finding that plaintiff is disabled and entitled to benefits. Mot. 11–12.

"Social Security disability determinations are investigatory, or inquisitorial, rather than adversarial." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). Thus, the ALJ has an affirmative duty and responsibility to develop the administrative record before making a disability determination. *See* 20 C.F.R. § 404.1520b(b). "As part of this duty, the ALJ must investigate the facts and develop the arguments both for and against granting benefits." *Anderson v. Comm'r of Soc. Sec.*, No. 22-cv-01509, 2025 WL 660330, at *14 (E.D.N.Y. Feb. 28, 2025). "When there are inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others." *Bryant*, 2022 WL 17540581, at *13.

Generally, "[a] consultative examination is used to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow the ALJ to make a determination or decision on the claim." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013) (citing 20 C.F.R. §§ 404.1519a(b), 416.919a(b)). "It can be reversible error for an ALJ not to order a consultative examination when an examination is required for an informed decision." *Id*. However, the ALJ need not seek additional information "where there are no obvious gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999). If there are no obvious gaps, "remand is not always required when an ALJ fails in his duty to request opinions" especially if "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi*, 521 F. App'x at 34.

At the Hearing, plaintiff's attorney suggested the ALJ should order another consultative examination to assess his client's specific RFC capabilities. R. 74. The ALJ entertained the idea and noted it had been over a year since plaintiff's examination with Dr. Meisel. R. 74. The ALJ acknowledged that "what I have in the file just might not be enough objectively to get me to what I need." R. 75. Addressing to plaintiff the importance of attending the consultative examination if ordered, the ALJ stated: "maybe I can get to the point where I can explain, you know, this is an individual that's got to have his legs elevated a majority of the day." R. 75. Addressing plaintiff's concerns for paying future medical costs, the ALJ stated: "I'm just trying to find documentation of these—the lower extremity swelling. Because again, if I'm going to find that, you know, you got to take a lot of breaks or you're going to be intermittently off task throughout the day because of your symptoms or you got to recline, I got to point to something in the record . . . my initial

notes just didn't have enough objective evidence in the file in terms of exam findings. So I might have to send you out to that [consultative examiner]." R. 76.

Plaintiff suggests that the ALJ's failure to order another consultative examination was because the ALJ was "content to rely on a deficient record in order to cut down the plaintiff's claim." Mot. 11–12. Review of the hearing transcript proves otherwise. At the Hearing, the ALJ noted that he was "look[ing] to see what is going to get me over the hump so to speak with regards to getting [plaintiff] his benefits," because the plaintiff had "paid into the system" and the ALJ wanted to "reward [the plaintiff] if I can do it within my rules" but might have to use "a little bit of creativity." R. 73–74.

In fact, plaintiff's testimony regarding the elevation of his legs was prompted by the ALJ. When asked to describe what he does during the day, the plaintiff testified that he gets up, shaves and showers, has coffee, some cereal, and then reads and makes phone calls. R. 64. The ALJ specifically asked whether plaintiff typically elevates his lower extremities when he sits, and plaintiff replied: "Yes." R. 64. Plaintiff also testified that he has a recliner he likes to sit in and which he bought because it helps him raise his feet. R. 64. This is the extent of plaintiff's testimony regarding the need to elevate his legs while sitting. Plaintiff did not testify that elevating his feet was necessary or that any medical professional had recommended that he do so. R. 64. Plaintiff was seen by various medical professionals during the relevant period, none of whom recommended that he elevate his legs the majority of the day. When asked by the ALJ, "your own primary care doctor hasn't recommended any treatment for the [leg edema]?" plaintiff responded "No" and stated that his doctor "hasn't really said anything much about it." R. 63.

Ultimately, "the decision whether to seek the opinion of a medical expert is discretionary." *Falco v. Comm'r of Soc. Sec.*, No. 21-cv-02999, 2025 WL 510061, at \*9

(E.D.N.Y. Feb. 14, 2025). Despite plaintiff's contention, "the ALJ is under no [] obligation to recontact treating sources or order consultive examinations as long as [he] could reasonably make a determination based upon the evidence already presented." *Id*. (citing 20 C.F.R. §§ 404.1513a(b)(2), 404.1520b). As previously discussed, the ALJ extensively discussed the available medical records which included eleven examination reports and one medical source statement from his endocrinologist, nine examination reports from his primary care physician, a physical examination report from a consultative examiner, two state agency medical consultant reports, and plaintiff's own statements. Examined as a whole, these records suggest largely unremarkable findings with only intermittent or negative signs of edema, stasis, or pain in the lower extremities.

There is nothing in the record to suggest that a more detailed or accommodating RFC was necessary for plaintiff. The current RFC adequately considered plaintiff's potential edema, stasis, or pain in his lower extremities. As there is no "inconsistenc[y], gap[] or ambiguit[y] in the record" preventing the ALJ from adequately assessing plaintiff's RFC, there was no need to develop the record any further. *Bryant*, 2022 WL 17540581, at *13.

**CONCLUSION**

For the reasons stated above, plaintiff's motion is DENIED and the Commissioner's cross-motion is GRANTED.

**SO ORDERED.**

　　　*/s/ Natasha C. Merle*　
NATASHA C. MERLE
United States District Judge

Dated:　　May 23, 2025
　　　　　Brooklyn, New York